IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NATALIE JOHNSON,

                      Plaintiff,                    OPINION AND ORDER

    v.                                                          19-cv-760-wmc

C. R. BARD, INC., and BARD
PERIPHERAL VASCULAR, INC.,

                      Defendants.

      A jury found defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. ("Bard"), strictly liable for failing to warn physicians adequately of the dangers posed in the placement, retention and extraction of Bard's removable Meridian filter. The jury then awarded plaintiff Natalie Johnson $3,300,000 in damages following the fracturing of her filter with two of its struts (or anchoring arms) irretrievably left behind. (Dkts. ##327, 333.) One became imbedded in the inferior vena cava ("IVC") of her heart and the other traveled to her heart's right ventricle before penetrating its wall into the pericardium. (Id.) Before the court is Bard's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for a new trial under Rule 59. (Dkt. #357.) That motion will be denied in its entirety because the court finds that: (1) defendants waived certain of these challenges by failing to raise them in a Rule 50(a) motion; and (2) as to those challenges that were preserved, the jury's verdict is supported by the evidence.

BACKGROUND

      The case itself was remanded following completion of multidistrict litigation ("MDL") related to alleged defects in various iterations of Bard IVC filters. On remand,

after this court disposed of several of plaintiff's claims at summary judgment, the jury considered Johnson's claims for strict liability and negligent design defect, as well as negligent and strict liability failure to warn. The jury found for defendants on all but plaintiff's claim for strict liability failure to warn.

A summary of past proceedings, including the conduct of three, earlier bellwether trials, and of the facts surrounding the development and use of the removable Meridian filter is set forth in the court's opinion granting in part and denying in part defendants' motion for summary judgment and remained largely unchanged by the trial. *Johnson v. C.R. Bard Inc.*, No. 19-CV-760-WMC, 2021 WL 1784661 (W.D. Wis. May 5, 2021). Defendants' pending motion to overturn the jury's verdict amounts to a shotgun approach, advancing a number of arguments under Rule 50(b) and 59. Even so, there is a through line of defendants' attempts to attack the sufficiency of evidence for a reasonable jury to find that: (1) there were defects in defendants' product disclosures with respect to the risks of Meridian filter not properly anchoring or migrating and splintering, especially if not removed timely; and (2) even if those disclosures were defective, they were a cause of plaintiff Johnson's injuries.

Ultimately, the focus of the post-verdict briefing is on the adequacy of the warnings provided to Dr. Goncharova, as the surgeon who chose to insert the Meridian filter. Dr. Goncharova also planted the filter in Johnson's IVC and ultimately, failed to inform Johnson in the risks of its remaining there. However, unlike at summary judgment, plaintiff Natalie Johnson put the importance of the warnings in context. First, Natalie Johnson was hardly a typical surgical patient. She was a surgical technician and a scrub

nurse for over fifteen years when she followed Dr. Goncharova's advice to implant an IVC filter in conjunction with a vein ablution to remove varicose veins.  Previously, Johnson had experienced deep vein thrombosis ("DVT") after Dr. Goncharova performed a series of vein ablutions, so when she returned four years later, both Dr. Goncharova and Johnson were concerned about another DVT.  Dr. Goncharova advised Johnson that she wanted to place an IVC filter this time around.  Johnson testified that her "only concern at the time" was that the filter not "be permanent," to which Dr. Goncharova assured her the Meridian filter "could be retrieved within a year."  Finally, Johnson testified that she would not have agreed to placement of the filter had she been told it "couldn't be removed or that there would be difficulty in removing the filter after a year."

A CT scan taken a few days after surgery showed the filter had tilted and migrated into the pericardia.  Dr. Goncharova's attempt to remove the filter percutaneously (that is, directly through the skin) was unsuccessful.  Monitoring the filter over time, another attempt was made to remove the filter almost four years later.  At that time, a specialist was able to retrieve most of the filter and one of the fractured struts, but not the strut embedded in the right ventricle.  The surgeons decided it was safer to leave the struts rather than attempt removal, although plaintiff's expert emphasized that Johnson continued to face a risk of future complications, including hemorrhage, pericardia tamponade, arrythmia, and cardiac damage.  The expert further opined that because another fragment of the filter had migrated into the IVC wall *during* its removal, Johnson also faced complications including risk of infection, chronic pain or irritation, and hemorrhage.

3

The court is satisfied that that plaintiff advanced sufficient evidence for the jury to find that instructions could have reduced the foreseeable risks of using and failing to remove the Meridian filter and a that the defects in those warnings were more likely than not a cause of plaintiff's damages. The court will take up defendants' arguments in the order presented.

OPINION

**I. Rule 50(b)**

Under Rule 50, judgment may be granted as a matter of law where there is no "legally sufficient evidentiary basis" to uphold the jury's verdict on that issue. Fed. R. Civ. P. 50(a). In reviewing a Rule 50 motion, the court must "examine the evidence presented, combined with any reasonably drawn inferences, and determine whether that evidence sufficiently supports the verdict when viewed in the light most favorable to the non-moving party," which is the plaintiff, Natalie Johnson, as to the finding of strict liability duty to warn. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013).

In particular, the court will not make credibility determinations or weigh the evidence. Rather, the court must assure that more than "a mere scintilla of evidence" supports the jury's verdict, *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007), and reverse "only if no rational jury could have found for the prevailing party." *AutoZone, Inc.*, 707 F.3d at 835. Moreover, "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010); *see also*

*Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010) (refusing to consider the defendant's argument that plaintiff failed to demonstrate he suffered an adverse employment action, in part because the defendant did not raise the argument under Rule 50(a) motion); Fed. R. Civ. P. 50 cmt. 1991 Amendments ("A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.").

A.  Failure to Warn:  Risk Reduction Theory

As an initial matter, defendant argues in effect that plaintiff failed to support her duty to warn claim under a risk-reduction theory, warranting judgment as a matter of law under Wis. Stat. § 895.047, which mirrors § 2 of the Third Restatement of Torts.  (Def.'s Mot. (dkt. #357) 5.)  Specifically, defendants note that commentary from the Third Restatement suggests § 2 is about risk-reduction warnings, *not* informed decision-maker warnings.  (Id.)

In so arguing, defendant is now attempting to imbue Wis. Stat. § 895.047(a) with a narrower meaning than they had ever argued before or during trial.  More importantly, defendants did not object to the court instructing the jury based on the relevant language in Wis. Stat. § 895.047 itself.  (Def.'s Obj. (dkt. #135) 9.)  Digging through the commentary of the Third Restatement of Torts after the trial ended in order to reinterpret the supposed true reach of a Wisconsin statute is neither fair to plaintiff nor to the jury. Indeed, the entire argument depends on acceptance of a narrower claim *never* offered before trial nor even made in defendants' Rule 50(a) motion.  In particular, no mention of risk-reduction or informed decision-making warnings were ever mentioned in either parties' previous filings to this court.  Accordingly, this argument has been waived.

5

Even if not waived, the evidence at trial *is* sufficient to satisfy this narrower right to relief given the proven importance of the filter's migration rate to surgeons generally and to Dr. Goncharova and plaintiff in particular. As Dr. Hurst explained, that information would likely have at least resulted in much closer monitoring of migration of the filter and its removal no later than six months after placement in Johnson's IVC.

### B. Failure to Warn: Causation

Alternatively, defendants contend that there was insufficient evidence to support the jury's finding of causation for strict liability failure to warn both at summary judgment and trial. As the physician who implanted the filter, Dr. Goncharova testified at trial. According to the defendant, however, her testimony was insufficient to prove causation because: (1) her testimony was based on false assumptions offered by counsel; and (2) she did not specifically identify the alternative filter she would have used. (Def.'s Mot. (dkt. #357) 9.) As to the first argument, defendant states that Dr. Goncharova's opinions were based on figures erroneously provided by plaintiff's counsel from Bard's Recovery Filter report ("EVEREST"), showing a 62% rate of migration for the Meridian filter. (Def.'s Mot. (dkt. #357) 10.) Assuming this 62% migration rate, Dr. Goncharova opined that she would not have used the Meridian filter. (Id. at 9.) Defendants contend that the EVEREST study did *not* show a 62% migration rate; instead, after taking into account migration "thresholds" set by the Society of Interventional Radiology, there was a much lower rate of migration. (Id. at 10.)

However, Bard advanced this same argument to the jury at trial, asserting that only migrations over a certain threshold should truly be considered migrations, which the jury

6

either rejected or still found would have been material to an objective surgeon, including Dr. Goncharova. Moreover, even defendant's own expert agreed that the EVEREST report showed a migration rate around 60%. (Tr. 5-A-151:4-17.) Additionally, defendant's counsel cross-examined Dr. Goncharova about this 62% figure, yet after establishing that was the migration rate that plaintiff's counsel asked her to assume, counsel's only follow up question established that if the migration rate were "less than 1 percent," Dr. Goncharova would have found the rate "acceptable." (Tr. 5-A-14-20.) Finally, the jury had been told at the outset of the trial that they should only credit opinion testimony based on an assumption *if* that underlying assumption is also proved to their satisfaction.

Thus, the jury had the opportunity to evaluate Bard's challenge to the 62% figure as an inaccurate reading of the EVEREST study when evaluating Dr. Goncharova's testimony. Ultimately, the jury had a legally sufficient evidentiary basis for rejecting Bard's interpretation of EVEREST study or finding that interpretation not materially significant, as well as for judging the credibility of Dr. Goncharova's testimony as to the significance of a high migration rate.

As for defendants' second argument that Dr. Goncharova did not specify a treatment alternative, Wis. Stat. § 895.047(1)(a) states in relevant part:

> A product is defective because of inadequate instructions or warnings only if the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe.

Due to the "learned-intermediary doctrine," this court previously found and advised the jury that plaintiff must prove any warning would have changed Dr. Goncharova's actions.

7

*See In re Zimmer, NexGen Knee Implant Prod. Liab. Litig.*, 884 F.3d 746, 751 (7th Cir. 2018) ("given the opportunity, the Wisconsin Supreme Court would join the vast majority of state supreme courts and adopt the learned-intermediary doctrine.")

Defendants argue that, in order to show that her actions would have changed, Dr. Goncharova must have pointed to a specific removable filter she would have used instead of the Meridian IVC filter. (Def.'s Mot. (dkt. #357) 11.) Before, during and after trial, defendant cited no legal precedent or persuasive authority for this proposition, and nothing in the language of the statute or relevant case law suggests that Dr. Goncharova must have explicitly pointed to a *single, equivalent* medical device that she would have used. Instead, it is enough that she would not have made the same treatment decisions if warned, whether it be closer monitoring and removal of the Meridian filter after insertion *or* selecting a reasonable alternative filter on the market. Regardless, defendant ignores that plaintiff presented testimony showing the Denali filter or Simon Nitinol Filter, which were also offered by Bard, would have been preferable alternatives, particularly when it came to migration and breakdowns once implanted. (Pl.'s Rep. (dkt. #359) 9.) Moreover, Dr. Goncharova testified that with greater disclosure of the associated risks, she would "not use the Meridian filter," in part because there are "different filters available on the market" that are "safer." (Tr. 5-A-44:5-8.) Finally, Dr. Goncharova testified that if she knew the filter was not designed to become permanent, she would have made different treatment decisions as well. (Tr. 5-A-39:7-15.) All of this testimony was sufficient for the jury to find that Dr. Goncharova "would have altered [her] behavior and avoided injury [to her

8

patient].' *Kurer v. Parke, Davis & Co.*, 2004 WI App 74, ¶ 25, 272 Wis.2d 390, 679 N.E.2d 867.

### C. Proximate Causation

Lastly, defendants argue that there is no proximate cause connecting the injury and Bard's conduct. (Def.'s Mot. (dkt. #135) 12.) Under Wisconsin law, public policy and proximate cause are synonyms in the context of tort liability. *Fandrey v. Am. Family Mut. Ins. Co.*, 2004 WI 62, ¶ 9, 272 Wis. 2d 46, 680 N.W.2d 345. Indeed, defendant is essentially arguing that holding Bard liable would be against public policy because it was likely that Dr. Goncharova's negligent placement of the Meridian filter to close to the top of the IVC led to Johnson's injuries rather than any failure to warn by Bard. (Def.'s Mot. (dkt. #135) 14.) The court is unpersuaded, as more importantly, was the jury. First, the contemporaneous pictures after placement show the filter may have been slightly higher than recommended, but not so high as to cause displacement, much less a catastrophic failure of the filter. Second, Johnson's treating physician opined that she was doing alright until the filter was left in for years rather than days or months. Third, Bard had the opportunity to advance its assertion in front of the jury that there was nothing wrong with the Meridian filter, and the jury declined to accept. Reversing that decision under the guise of some amorphous public policy would be to supplant the jury's role in weighing the evidence and arguments before it.[1]

---

[1] Additionally, this proximate cause argument was never raised in defendant's 50(a) motion and appears waived as well.

**II. Rule 59**

Defendants have also moved for a new trial under Rule 59, which "may be granted only if the jury's verdict is against the manifest weight of the evidence." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006) (citing *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003)). To meet this standard, defendants must demonstrate that no rational jury could have rendered a verdict against them. *See King*, 447 F.3d at 534 (*citing Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004)). Again, in applying this standard, the court must view the evidence in a light most favorable to plaintiff, leaving issues of credibility and weight of the evidence to the jury. *King*, 447 F.3d at 534. Thus, "[t]he court must sustain the verdict where a 'reasonable basis' exists in the record to support the outcome." *Id*. (quoting *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004)).[2]

### A. Timing of Dr. Goncharova's Testimony

Dr. Goncharova was meant to testify during plaintiff's case-in-chief on the first day of trial; however, she initially chose to ignore the court's subpoena, despite being timely served. Only after the court itself reached out to the U.S. Marshal's Office and her employer did Dr. Goncharova appear to testify on the last day of the trial on liability. Defendants argue this timing was prejudicial and that Bard did not have time to properly

---

[2] The court may also grant a new trial if "the trial was unfair to the moving party." *Lust v. Sealy, Inc.*, 277 F.Supp.2d 973, 993 (W.D.Wis. 2003) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003). However, for reasons explained above, that more amorphous standard is no more applicable to the facts of this case than the "manifest weight" standard.

reply to Dr. Goncharova's testimony. Defendant was aware, however, that (1) Dr. Goncharova was a potential witness and (2) the court was following up to enforce its subpoena and ensure her appearance. (Pl.'s Rep. (dkt. #359) 15.) Indeed, Dr. Goncharova had been deposed, subpoenaed, and named as part of plaintiff's list of witnesses before the trial even started. (Id.) Moreover, counsel for defendants had obviously prepared for her testimony. Finally, while Dr. Goncharova testified regarding causation, separate records and testimony helped prove causation and plaintiff was always free to call her in rebuttal.

Indeed, at summary judgment, the court had already found that plaintiff had produced sufficient evidence for a reasonable jury to conclude "Dr. Goncharova would have altered her behavior," even without any direct testimony from her. *Johnson*, No. 19-CV-760-WMC, 2021 WL 1784661, at *8. Specifically, plaintiff's expert, Dr. Hurst, suggested that any reasonable surgeon provided with the actual performance data about the Meridian filter would not have used it, and at minimum, would have removed it no later than six months after surgery. If anything, plaintiff's testimony at trial as to the importance of removability being her only concern, in talking to Dr. Goncharova about inserting the Meridian filter pre-surgery, strongly bolstered that opinion. While helpful to plaintiff's case, therefore, Dr. Goncharova's testimony was not necessarily dispositive of plaintiff's proof of causation.

In the end, "the district court is invested with broad, discretionary powers in allowing a party to reopen its case." *U.S. v. Green*, 757 F.2d 116, 119 (7th Cir. 1985). Here, both sides knew Dr. Goncharova was a potential witness, and that the court intended to intervene to enforce its subpoena after being timely served on her, even if it delayed her

11

testimony until later in the trial. "The trial judge must meet situations as they arise." *Caruth v. Pinkney*, 683 F.2d 1044, 1051 (7th Cir. 1982). Under all the facts here, the timing of Dr. Goncharova's testimony was necessitated through no fault of plaintiff, nor was it unfairly prejudicial to defendants.

### B. Scope of Dr. Hurst's Trial Testimony

Similarly, to the extent that Dr. Hurst may have provided testimony in conflict with his expert report, defendant's failure to cross-examine on that point, timely object to his testimony as beyond the scope of his report *or* ask for other relief until this post-trial motion constitutes plain waiver. Specifically, in his expert report, Dr. Hurst wrote that in a scan taken 3 days after the filter's placement in plaintiff's IVC, the "apex of the filter [is] now 3mm below the inferior cortical margin of the right pedicle of L1," which represented a 3-millimeter downward shift since placement, and he testified to this same measurement at his deposition. (Hurst Ex. (dkt. #110, ex. #3) 4.) However, at trial, Dr. Hurst said, "the device had migrated approximately 2.5 centimeters north." Tr. 3-P-16:12-14. Later, Dr. Hurst repeated his cranial migration claim during cross-examination, again stating, "It migrated cranially." Tr. 3-P-83:12.

Defendants' counsel, though, were the ones who *chose* not to impeach Hurst with his report or deposition testimony on this point or ask for other relief regarding his trial testimony. Nor did counsel even object the first time Dr. Hurst made this statement at trial, and defendant failed to even refer to Hurst's testimony of cranial migration during cross-examination. Indeed, the only objection counsel interposed for defendants was to a demonstrative showing cranial migration of the filter, *not* to Dr. Hurst's testimony as to

12

when and how far this occurred.  (Tr. 3-P-27:6-12.)  Even so, the court then agreed to order Dr. Hurst not to say "anything about the direction" of the filter's migration with respect to the demonstrative exhibit.  Tr. 3-P-31:24.  Lastly, defendants also never moved to strike any of Hurst's testimony from the record or asked for a curative instruction.

Only now, in defendants' motion for a new trial, did they ask for relief regarding Dr. Hurst's undisclosed opinion.  Combined with the lack of a timely objection to Dr. Hurst's testimony, this, too, constitutes waiver.  *See Christmas v. City of Chicago*, 682 F.3d 632, 640 (7th Cir. 2012) ("Plaintiffs did not object to the officer's specific testimony at trial but instead asked the district judge to admonish the witness . . . [b]y failing to object, Plaintiffs may not raise the issue for the first time in a motion for a new trial.").

### C. Non-Defectiveness

As previously argued at summary judgment, defendants also assert that they were entitled to a rebuttable presumption of non-defectiveness under Wis. Stat. § 895.047(3)(b) based on the fact that the filter was FDA approved.  As this court already held at summary judgment, however, "a product that has complied with the FDA's § 510(k) review process is *not* entitled to Wisconsin's statutory presumption." *Johnson*, No. 19-CV-760-WMC, 2021 WL 1784661, at *6 (*citing MacPherran v. Bos. Sci. Corp.*, No. 20-CV-766-JDP, 2020 WL 7061044, at *3-4 (W.D. Wis. Dec. 2, 2020).)  Rather, the 501(k) process is clearance for products that are "equivalent" to previously approved devices, and Bard's Meridian removable filter was cleared based on the former approval of Bard's original *permanent* filter.  *Id*.  Similarly, in one of the original, bellwether cases regarding the Bard Meridian filter, the District of Arizona found that "[b]ecause the 510(k) clearance process

focuses on equivalence, not safety, the presumption of non-defectiveness afforded by § 895.047(3)(b) is not applicable." *Hyde v. C.R. Bard*, No. CV-16-00893-PHX-DGC, 2018 WL 3586404, at *6-7 (D. Ariz. July 26, 2018) (applying Wisconsin law). Not only does the court continue to agree with that assessment, but the evidence at trial further identifying the increased risks of migration and reduced long-term viability of retrievable IVC filters only highlights the lack of equivalence.

### D. Product Misuse

Defendants allege that they deserved a jury instruction for product misuse, as Dr. Goncharova had placed the filter higher than the instructions suggested. (Def.'s Mot. (dkt. #135) 23.) The requested instruction read as follows:

> If you find that the Meridian filter was used in a manner other than its intended use, and that Ms. Johnson's injuries occurred because it was used in a manner that was not foreseeable to Bard, then you must find in favor of Bard.

(Dkt. #240 Ex. D.) The problem with this instruction was not its failure to relieve defendants of liability due to product misuse, but rather the requirement that the misuse *not* be "foreseeable."

At trial, there was simply no evidence that placing the filter in a less-than-ideal location was unforeseeable to Bard. On the contrary, deployment and placement of the IVC percutaneously with blood flowing to the heart was recognized as challenging. Plus, Dr. Goncharova's placement itself was, at worst, only about 3 millimeters from what defendants instructed was an "ideal positioning." (Hurst Ex. (dkt. #110, ex. #3) 4.) In the end, defendants offered (and still offer) no evidence that such a slight misplacement

14

was unforeseeable; instead, they merely argue somewhat cryptically that this placement is unforeseeable if "a medical device with specific instructions for use . . . were violated by a medical professional." (Def.'s Rep. (dkt. #362) 15.)

As for their entitlement to the jury instruction, defendants mainly rely on *Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 218 N.W.2d 279 (1974), which states that "a plaintiff, to recover in strict liability in tort, must establish that the product proved defective, and the injury occurred when it was used in a foreseeable manner." *Id*. at 742. Notably, however, the Wisconsin Supreme Court in *Schuh* also held as a matter of law that the plaintiff in that case *was* misusing the product in a *foreseeable* manner:

> The manufacturer saw fit to put a warning sign on the machine to warn of the danger of standing on it, and a warning to stay off the machine unless a seat or platform was provided. If the manufacturer was able to foresee the necessity of warning users to stay off the machine, it must have foreseen that under some circumstances users and others would stand on the implement. Thus, standing on the machine was a 'misuse' of it, such as was foreseeable by the defendant and such misuse would not ipso facto bar recovery.

*Id*. at 743. Thus, the Supreme Court explained, "it is not necessarily a complete defense to liability to show that the machine was being used [unsafely]." *Id*. at 741.

Here, too, defendants claimed that "Dr. Goncharova placed Plaintiff's filter too high in violation of the instructions given." As in *Schuh*, therefore, the fact that Bard thought ahead to warn about putting the filter nearer than 3 inches to the opening to the renal veins suggests that the danger of putting the filter too high was a foreseeable misuse. With evidence that the misuse was foreseeable, no evidence that it was not, and a failure to stress

15

the risks associated with a foreseeable misplacement, the court's denial of Bard's additional misuse instruction was proper.

### E. Damages

At trial, the jury awarded Johnson $3.3 million in damages, which defendants now contend is excessive. As the Wisconsin Supreme Court has held:

> The amount of damages awarded is a matter resting largely in the discretion of the jury. The verdict will not be upset merely because the award was large or because the reviewing court would have awarded a lesser amount, but rather only where it is so excessive as to indicate that it resulted from passion, prejudice, or corruption, or a disregard of the evidence or applicable rules of law.

*Kablitz v. Hoeft*, 25 Wis.2d 518, 525, 131 N.W.2d 346 (1964). Bard can offer no such evidence. On the contrary, the jury's deliberations for two days on liability and another hour and 10 minutes on damages, resulting in its rejecting all but one of plaintiff's claims and plaintiff's request for a punitive award, both are powerful evidence of the care the jury took in arriving at a fair and just verdict.

Bard also argues that the evidence is unable to support such a large verdict, since Johnson never had symptoms from her filter fracture. (Def.'s Mot. (dkt. #135) 25.) Instead, defendants argue just as they did to the jury, that most of Johnson's injuries were "based solely on the anxiety caused by the presence of a fractured strut in her heart, and her worry over the future complications that could arise as a result." (Id.) Even ignoring that plaintiff also has a strut embedded in her IVC, the fact that defendants or its counsel are casual about a piece of metal in the right ventricle of plaintiff's heart does not mean that a reasonable jury could not find that plaintiff credibly described her ongoing anxiety

16

and worry. This is especially true since Johnson was a surgical nurse painfully aware of what could go wrong should another strut shift.

On the contrary, defendants must compensate a plaintiff for the injury to her personally, not some theoretical, objective individual. *Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403, 404 (1891). Moreover, while Johnson has not yet suffered a physical calamity, there was sufficient evidence to support a jury's finding that the risk she still may is real and of profound concern to her. Indeed, one of the broken struts from the filter has already traveled to Johnson's heart, while the other perforated her spine, intestine, and psoas muscle. (Pl.'s Opp. (dkt. #359) 24.) Johnson also had surgery to attempt to remove the broken filter which failed, leaving the broken pieces in her body. (Id.) While the strut pieces could remain stable, the jury was also told they may move at any point and travel further into Johnson's heart or other parts of her body, which means that plaintiff must be monitored on an ongoing basis for movements that may necessitate risky, emergency surgeries. (Id.) Johnson also credibly and powerfully testified to her own stress and anxiety regarding her condition, at one point explaining to the jury that she "[has] to listen to [her] heart beat every day and think that perhaps that would be the day that I'll drop dead." Tr. 27:20-22.

Nevertheless, defendant contends that Wisconsin law does not support the jury's award, as "fear of future surgery is not reasonably certain . . . when a medical witness describes to the victim or to the jury remotely conceivable complications which may develop from the physical injury caused by the defendant's negligence." *Brantner v. Jensen*, 121 Wis.2d 658, 667, 360 N.W.2d 529 (1985). However, *Brantner* also held that a "fear

17

of surgery may be reasonably certain, even though there is no certainty that surgery will occur and even though the physician cannot testify to a reasonable degree of medical probability that the consequence feared will occur." *Id*. More importantly, the possibility of emergency surgery for Johnson is not merely "remotely conceivable," as Johnson has undergone one failed removal surgery, received multiple assessments by cardiovascular surgeons as to the advisability of trying again, and is now painfully aware that several others have been injured by IVC filter fragments requiring surgical removal. Certainly, the risk that Johnson will face the same is not totally quantifiable, but it is *not* so remote as to be divorced from the facts, or at least a reasonable jury could and did so find.

Just as the Wisconsin Supreme Court concluded in *Branter*, therefore, "evidence of the possibility of future surgery may be considered by the fact finder in determining compensable damages for mental distress for fear of future consequences of the injury." *Id*. at 669. Regardless, this court has no sound basis to question the jury's good faith effort to quantify Johnson's risk of future surgeries, as well as her present fear and anxiety.

Finally, defendant argues that other IVC filter cases with more seriously injured patients resulted in jury verdicts much less than $3.3 million. (Def.'s Rep. (dkt. #362) 17.) Of course, other cases may be instructive, but damages are ultimately based on the facts presented in the individual case, making "comparison of the challenged awards to the amount awarded in other unreported cases . . . showing equally or more serious injuries with lower awards . . . not particularly helpful." *Staskal v. Symons Corp.*, 2005 WI App 216, ¶ 44, 287 Wis.2d 511, 706 N.W.2d 311. Moreover, this court has "discretion in declining to use [those] cases . . . to decide what was reasonable in this case." *Id*. Since these other,

18

cited cases may have awarded lower damages due to a difference in proof of risk, placement of the struts, plaintiff's credibility and unique characteristics, more varied evidence, or any of a number of other factors, the court declines to use those awards as a yardstick of excessiveness here. Ultimately, the court must defer to the jury's judgment as long as "there is any credible evidence." *Id.* at ¶ 39. And since there is credible evidence underpinning the jury's damages award, the court will not second guess it.

## ORDER

IT IS ORDERED that:

1) Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.'s Judgment as a Matter of Law (dkt. #357) is DENIED.

2) Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.'s request for new trial (dkt. #357) is DENIED.

3) Plaintiff's motion requesting a status conference (dkt. #369) is DENIED AS MOOT.

Entered this 31st day of August, 2022.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge